

```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------x
SEBASTIAN DIMEGLIO,
                                              MEMORANDUM AND ORDER
                 Plaintiff,                   Case No. 05-CV-4538 (FB) (JMA)

        -against-

BRIDGESTONE/FIRESTONE AMERICAS
HOLDING INC.,

                 Defendant.
------------------------------------------------------x
```

*Appearances:*
*For the Plaintiff:*　　　　　　　　　　*For the Defendant:*
HAROLD SKOVRONSKY, ESQ.　　　　MARA B. LEVIN, ESQ.
1810 Avenue N　　　　　　　　　　　Herrick, Feinstein LLP
Brooklyn, NY 11230　　　　　　　　　2 Park Avenue
　　　　　　　　　　　　　　　　　　New York, NY 10016

**BLOCK, Senior District Judge:**

Plaintiff Sebastian DiMeglio ("DiMeglio")[1] sues Bridgestone/Firestone Americas Holding, Inc. ("Firestone"). Proceeding under section 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), he alleges that Firestone wrongfully denied his claim for long-term disability benefits on the ground that he had made a false statement on his application for coverage.

Pursuant to Federal Rule of Civil Procedure 56, both parties moved for summary judgment;[2] the Court heard oral argument on August 9, 2007. For the reasons

---

[1] Whereas the caption lists plaintiff's name as "DIMEGLIO," it is spelled "DiMeglio" throughout the complaint. The Court adopts this spelling.

[2] In addition to an ERISA claim, DiMeglio has also asserted a claim under state common law, alleging that Firestone's denial of his claim amounts to a breach of contract. DiMeglio does not address the contract claim is his motion for summary

set forth below, plaintiff's motion for summary judgment is granted, Firestone's motion is denied and the matter is remanded to the administrator of Firestone's Long-Term Disability Benefits Plan ("the Plan").

I.

The following material facts – taken from the administrative record and the parties' Rule 56.1 statements – are not in dispute.[3]

DiMeglio began working for Firestone in 1988. In 1997, he sought coverage under the Plan as a late enrollee. As such, he was required to provide evidence of good health in the form of a medical questionnaire. *See* Aff. of Sandie K. Fugitt ("Fugitt Aff."), Ex. A (Long Term Disability Benefits Plan ("Plan")) at 1 (defining "late enrollee" to include "Eligible Employee [who] must furnish . . . evidence of good health . . . [i]f [he] does not file his enrollment form within thirty-one (31) days after his Date of Eligibility").

On the questionnaire, DiMeglio checked a box marked "NO" in response to a question as to whether, "[d]uring the last 15 years," he had "been diagnosed or received treatment by/from a member of the medical profession" for "[g]out, arthritis, rheumatism,

---

judgment, but Firestone, in its motion, contends that the contract claim is preempted by ERISA; the Court agrees. *See, e.g., Nelson v. Unum Life Ins. Co.*, 421 F. Supp. 2d 558, 574 (E.D.N.Y. 2006) ("ERISA preempts state law claims that 'relate to' employee benefit plans." (citing 29 U.S.C. § 1144(a)). Accordingly, the contract claim is dismissed.

[3]Under the Plan, a claim for long-term disability benefits is first submitted to Firestone's Disability Committee ("Disability Committee"); if the Committee denies the claim, the employee may appeal to Firestone's Pension Board ("Pension Board"), whose determination represents Firestone's final decision on the claim. The administrative record refers to the documents compiled by both the Disability Committee and the Pension Board in processing DiMeglio's claim.

neck or back strain/sprain/injury, any deformity or loss of limb, or other disease or disorder of the back, spine, muscles, bones or joints." A.R. at 104 (Statement & History of Physical Condition dated May 12, 1997 ("Questionnaire")).[4] Firestone approved DiMeglio's application and he became a covered employee under the Plan.

DiMeglio stopped working for Firestone in January 2001. In July 2001, he submitted a claim for long-term disability benefits under the Plan. Although the claim form did not ask DiMeglio to state the nature of his disability, medical reports submitted to the Disability Committee reflect that he had recently been diagnosed with a herniated disc and osteoarthritis in his right hip:

- Radiographic examination report by Stuart Sheinbrot, M.D., dated December 18, 2000, stating "[n]arrowing is present at the L4-L5 disc space" and noting "prominent degenerative arthritic changes at the right hip," *id.* at 105;

- MRI report by Harold Tanenbaum, M.D., dated January 6, 2001, noting "History: Low back pain" and "abnormal findings at the disc spaces from L2 to S1," *id.* at 106;

- MRI report by Peter A. Ross, M.D., dated January 10, 2001, describing "degenerative changes" in DiMeglio's right hip, *id.* at 107;

- Letter from Ashok Anant, M.D. ("Dr. Anant"), dated January 16, 2001, stating that DiMeglio "present[ed] with a long history of lower back problems," *id.* at 108;

- Letter from consultative orthopedist John C. L'Insalata, M.D. ("Dr. L'Insalata"), dated January 22, 2001, stating that DiMeglio "[had] been having problems about his low back and hips area for many years" and "had an accident about twelve years ago when he landed onto his right side and jammed his knee and hip," *id.* at 109;

---

[4]"A.R." refers to the administrative record, attached as Exhibit B to Fugitt's affidavit.

3

- "Medical Certificate of Disability" from personal physician Dawn Gallo, D.O. ("Dr. Gallo"), dated July 9, 2001, stating "injury from past fall caused severe arthritis and consequent herniated disc leading to severe pain and depression," *id.* at 126;

- Diagnostic notes of Reuben Ingber, M.D., dated March 6, 2001, diagnosing DiMeglio with lumbar herniated disc and hip osteoarthritis, *see id.* at 143; and

- "Company Medical Doctor's Certificate of Disability" completed by Daniel W. Willen, M.D., on August 22, 2001, describing DiMeglio's medical condition at examination as osteoarthritis in the right hip, *id.* at 124; in an examination note dated July 5, 2001, Dr. Willen stated that DiMeglio had "no significant past medical history," *id.* at 112.

According to the Disability Committee, these medical records "indicate[d] [DiMeglio's] condition [was] caused or contributed to by an accident [he] had about twelve years [prior]," contradicting his negative answer on the medical questionnaire that he had not "[d]uring the last 15 years . . . been diagnosed or received treatment by/from a member of the medical profession" for "neck or back strain/sprain/injury . . . or other disease or disorder of the back, spine, muscles, bones or joints," A.R. at 104; the Disability Committee concluded that this answer was a "false statement" justifying a denial of benefits pursuant to section I(F) of the Plan. *Id.* at 152 (Letter dated Oct. 9, 2001). Section I(F) provides, in relevant part:

> If it is determined by the Plan Administrator that an employee, applicant or claimant made false, misleading or incomplete statements or withheld information in order to receive benefits, on any application for benefits, or during any review of his eligibility for benefits or made false, misleading or incomplete statements on any employment application or post-offer medical questionnaire related to his employment with the Company, the claim will be denied . . . . For purposes of this

4

> Section . . . , the term "statement" includes both written and
> oral statements and includes statements made to the Company,
> its representatives, the Pension Board or any other party.

Plan at 4.

DiMeglio appealed to the Pension Board. Before reviewing the Disability Committee's decision, the Pension Board asked DiMeglio to sign medical releases in order to obtain additional documentation from his pre-1997 physicians. DiMeglio signed the releases, as requested, and the Pension Board obtained the following documents, which became part of the administrative record:

- Notes of conversations in 2002 between Firestone's Senior Disability Analyst Sandie Fugitt ("Fugitt") and DiMeglio's wife, which shed some light on the references to a prior fall in the 2001 medical reports. According to Fugitt, Mrs. DiMeglio stated that her husband had an accident in 1989, following which he visited the emergency room and, later, Dr. George Moskowitz ("Dr. Moskowitz") and Dr. Robert Luca ("Dr. Luca"). *See* A.R. at 174. In a subsequent conversation, Mrs. DiMeglio told Fugitt that she "doesn't know why the 3 doctors referred to [an] injury 12 years ago." *Id.* at 208.

- Cigna Insurance Company records listing insurance claims for a visit to Maimonides Medical Center in April 1989 for "injury to face" and two visits to Dr. Luca in May 1992, both classified as "chiro" and "back." A.R. at 226.

- Handwritten notes from Dr. Moskowitz, who saw DiMeglio on several occasions between 1993 and 1997. Although Dr. Moskowitz's notes are largely unintelligible, it can be gleaned that DiMeglio complained of "back and (R) hip pain" on May 30, 1993, *id.* at 184, "low back pain" on June 18, 1996, *id.* at 189, and "back pain (upper)" on April 18, 1997, *id.* at 190; on the latter two occasions, DiMeglio was seeking treatment for a sore throat.

5

According to Fugitt, prior to the meeting of the Pension Board to consider DiMeglio's appeal, "the file was presented to Gregory Moten, D.O., the medical advisor to the Pension Board.... Dr. Moten offered his medical opinion based on his thorough review of the file . . . that [DiMeglio's] disabling condition resulted from the fall he had sustained about 12 years or so before that." Fugitt Aff. ¶ 33.[5]

The Pension Board, also citing section I(F) of the Plan, denied DiMeglio's appeal on the same grounds relied upon by the Disability Committee: Contrary to the answer he gave on his 1997 application, "the medical documentation . . . indicate[d] that [he] had been diagnosed with or treated for a back or neck strain/sprain/injury within the fifteen years prior to [his] application," and "[b]ased upon this documentation and the provisions of the Plan, the Board was compelled to deny the appeal." *Id.* at 241 (Letter dated Oct. 15, 2002).

## II.

"Where, as here, an insurance plan gives its administrator broad discretion to construe the terms of the plan and to determine whether a claimant is entitled to payment of benefits, a court may reverse the administrator's decision only if it is arbitrary and capricious." *Zervos v. Verizon New York, Inc.*, 277 F.3d 635, 650 (2d Cir. 2002) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). The Second Circuit has defined "arbitrary and capricious" as "without reason, unsupported by substantial evidence or erroneous as a matter of law." *Celardo v. GNY Automobile Dealers Health &*

---

[5]Apart from this description by Fugitt, the record does not contain any documentation of Dr. Moten's opinion.

*Welfare Trust*, 318 F.3d 142, 146 (2d Cir. 2003) (citation omitted). "Substantial evidence," in turn, is defined as "such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [decisionmaker]," *Miller v. United Welfare Fund*, 72 F.3d 1066, 1072 (2d Cir. 1995) (citation and internal quotation marks omitted); it is "more than a scintilla but less than a preponderance." *Id.*

## III.

### A. Diagnosis and Treatment

The terms "diagnosis" and "treatment" are not defined in Firestone's medical questionnaire, nor are they defined anywhere in the Plan. Stedman's Medical Dictionary, recognized as a leading authority by medical professionals, defines them as follows:

> Diagnosis: 1. The act or process of identifying or determining the nature and cause of a disease or injury through evaluation of patient history, examination, and review of laboratory data; 2. The opinion derived from such an evaluation.
>
> Treatment: Administration or application of remedies to a patient or for a disease or an injury; medicinal or surgical management; therapy.

*The American Heritage Stedman's Medical Dictionary* (2d ed. 2004). Worth noting is that both definitions involve some act by a medical professional (e.g., "determining the nature and cause of a disease or injury" or "application of remedies"). Firestone's questionnaire comports with these dictionary definitions, asking applicants if they have "been diagnosed or received treatment *by/from a member of the medical profession*." A.R. at 104 (Questionnaire) (emphasis added). Thus, a patient's subjective complaints, without any follow-up by a medical professional, would not constitute "diagnosis" or "treatment."

## B. Falsity of Statement

The parties dispute whether DiMeglio's answer on the 1997 medical questionnaire was false. DiMeglio contends that his answer was "fully accurate: during the period of 1982-97 there was no diagnosis or treatment for any of the enumerated conditions," Pl.'s Mem. of Law at 2; in support, he argues that "[t]he record is devoid of any contrary *contemporaneous* evidence" of pre-1997 diagnosis or treatment, claiming that (1) in 1992, "the chiropractor told [him] that he need[ed] no treatment, that his back [was] fine"; and (2) any back pain he complained of to Dr. Moskowitz prior to 1997 "was so transitory and minor that it was medically meaningless." *Id.* at 2-3 (emphasis in original).

At oral argument, Firestone's counsel conceded that there was no evidence of a pre-1997 diagnosis in the record, but insisted that evidence of pre-1997 treatment existed. *See* Tr. at 17 ("THE COURT: There's nothing here that says he was diagnosed in 1997. MS. LEVIN: No, there's no diagnosis . . . . THE COURT: And no treatment there either. MS. LEVIN: I believe we have [ ] treatment.").[6] The evidence that Firestone contends demonstrates pre-1997 treatments consists of (1) the 2001 reports of Drs. Anant, L'Insalata and Gallo, as well as the subsequent opinion of Dr. Moten based on his review of those reports; (2) the "[m]edical records from Dr. Moskowitz indicating that [DiMeglio] consulted with him for hip and back pain . . . less than one month before he applied for coverage under the Plan," *id.* at 9; and (3) the 1992 insurance records listing claims for "chiro" and "back," which, according to Firestone, show that "DiMeglio was treated . . .

---

[6]"Tr." refers to the transcript of the August 9th oral argument.

8

by Dr. Robert Luca for back problems in 1992." *Id.*[7]

None of these documents provides substantial evidence of pre-1997 treatment for "[g]out, arthritis, rheumatism, neck or back strain/sprain/injury, any deformity or loss of limb, or other disease or disorder of the back, spine, muscles, bones or joints." A.R. at 104 (Questionnaire). With respect to the 2001 reports, Drs. Anant opined only that DiMeglio had a history of back problems, while Drs. L'Insalata, Gallo and Moten added that the problems were caused by a prior accident (possibly a fall); none opined that DiMeglio had obtained treatment for a back injury prior to 1997. The only treatment DiMeglio received at the time of the accident was for an injury to his face.

---

[7]Firestone relied on the same evidence at oral argument:

| | |
|---|---|
| THE COURT: | And I have asked you before and I'll ask you one last time before you will sit down: Where in the record – I'm painstakingly giving you every opportunity to tell me – there is a record here of his being diagnosed or treated for back problems back in 1997[?] You haven't done that. |
| MS. LEVIN: | We have that he consulted with treating doctors and complained about back pain. |
| THE COURT: | Is there anything else, other than what we have talked about today, that you wish to rely upon? |
| MS. LEVIN: | And the support of his own personal physicians. |
| THE COURT: | Who are you talking about? You keep ta[l]king about his own personal physician. Name his name. |
| MS. LEVIN: | Well, these are in 2001, Your Honor. |

Tr. at 16-17.

9

With respect to Dr. Moskowitz's cryptic notes, they suggest, at best, that DiMeglio complained of back and hip pain prior to 1997. They make no mention that Dr. Moskowitz provided any treatment for any of the conditions listed on the questionnaire. Similarly, the insurance company's records are silent as to whether Dr. Luca treated DiMeglio for any of the conditions listed on the questionnaire; indeed, they provide no description of what treatment, if any, Dr. Luca provided.

In essence, Firestone posits that DiMeglio's prior injury plus his complaints of back pain must mean that he was diagnosed with or treated for one of the conditions listed on its questionnaire. Firestone was certainly permitted to draw reasonable inferences based on the evidence. *See Miller*, 72 F.3d at 1072 (defining "substantial evidence" as "such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [decisionmaker]"); *see also, e.g., Provident Life & Accident Ins. Co. v. Sharpless*, 364 F.3d 634, 641 (5th Cir. 2004) (holding that "district court's conclusion that [claimant] knowingly made false statements" about history of alcohol abuse was "fully supported by the record" in that she "consistently told her health care providers that she had sought treatment for alcohol use" prior to her application). It was not, however, permitted to base its decision upon mere speculation. *See, e.g., Miller*, 72 F.3d at 1073 ("[W]hile the Fund was not prohibited from agreeing with [its claim processor], [the claim processor's] speculation, without supporting medical evidence, is insufficient to justify the Fund's decision."); *Justus v. Roofers' and Waterproofers' Local No. 44*, 2007 WL 892997, at *11 (N.D. Ohio Mar. 21, 2007) ("[I]t is entirely reasonable for a court to conclude that reliance upon the opinion (or, in this case, speculation) of one physician was arbitrary and capricious.").

Firestone's logic crosses the line between reasonable inference and improper speculation: It is possible that DiMeglio's prior accident may have eventually contributed to a herniated disc in his lumbar spine and osteoarthritis in his right hip, but, as Firestone conceded, those diagnoses were not made until 2001. Nor, as shown, was there any evidence that DiMeglio received any treatment for those conditions prior to 1997; indeed, the record does not reflect that DiMeglio has *ever* received treatment for them.

Simply put, back pain is one of the world's most common complaints.[8] It does not follow that everyone who has ever complained of back pain, or has even gone so far as to visit a chiropractor, has received a diagnosis or treatment "from a member of the medical profession" for "[g]out, arthritis, rheumatism, neck or back strain/sprain/injury, any deformity or loss of limb, or other disease or disorder of the back, spine, muscles, bones or joints." A.R. at 104 (Questionnaire).

## B. Knowledge of Falsity

In *Shipley v. Arkansas Blue Cross and Blue Shield*, 333 F.3d 898 (8th Cir. 2003), the Eighth Circuit held that "a misrepresentation as to a material matter made *knowingly* in an application for an ERISA-governed insurance policy is sufficient to rescind the policy." *Id.* at 903 (emphasis added).[9] The Court is not aware of any case allowing a plan

---

[8]A recent global survey by the A.C. Nielsen Company found that headaches, colds, sleeping problems and back aches are the world's most common ailments. *See* http://us.acneilsen.com/news/20070828.shmtl (last visited Sept. 17, 2007).

[9]Plaintiff notes "the absence of any contention in defendant's moving papers that the plaintiff's so-called 'false statement' was a *material* misstatement which induced the defendant to provide coverage which it would not otherwise have provided." Pl.'s Mem. of Law at 4. There can be no dispute, however, that a statement denying

11

administrator to deny benefits based on an insured's mistaken or otherwise innocent misrepresentation, and Firestone's counsel has recognized that a denial of benefits would not have been proper under the Plan unless DiMeglio knew that his application statement was false. *See* Tr. at 7 ("My opinion is that it can't be false [for purposes of section I(F)] unless he has knowledge that it's false.").

Even if it be assumed that DiMeglio received treatment for back pain prior to 1997, there is no evidence that he knew that such treatment was for "[g]out, arthritis, rheumatism, neck or back strain/sprain/injury, any deformity or loss of limb, or other disease or disorder of the back, spine, muscles, bones or joints." A.R. at 104 (Questionnaire). As with the issue of falsity, any inference regarding DiMeglio's knowledge would be too attenuated to support Firestone's decision to deny benefits. For many medical conditions, the link between a particular condition and its treatment is so obvious that a patient's knowledge of the treatment's purpose can reasonably be imputed. Thus, for example, a person who received an appendectomy could reasonably be deemed to know that the procedure was meant to treat an inflamed appendix. Back pain, however, is much more amorphous in that it could relate to a number of causes – ranging from the natural process of aging to serious injury – only some of which would fall within the scope of Firestone's medical questionnaire.

---

diagnosis of or treatment for a serious back impairment, if untrue, would be material to Firestone's decision as it relates directly to the evidence of good health that DiMeglio was required to provide as a late enrollee. *See Shipley*, 333 F.3d at 905 ("In cases governed by ERISA, misstatements or omissions have been deemed material where knowledge of the true facts would have influenced the insurer's decision to accept the risk or its assessment of the premium amount." (collecting cases)).

In sum, Firestone's decision to deny benefits based on section I(F) of the Plan was not supported by substantial evidence. It must, therefore, be reversed as arbitrary and capricious.

## IV.

Since Firestone denied DiMeglio's claim based on the threshold determination that he was ineligible for benefits under section I(F) of the Plan, it did not reach the merits of his claim, which requires a determination as to whether DiMeglio was "totally disabled," as that phrase is defined in the Plan. *See* Plan, § III(A) ("A Covered Employee who is Totally Disabled shall be entitled to receive from the Plan a monthly amount . . . equal to sixty percent (60%) of his Eligible Monthly Earnings, less . . . Benefit Deductions[.]"). Although there is medical evidence supporting DiMeglio's claim, it would be inappropriate for the Court to pass on its merits without first giving Firestone the opportunity to do so. *See Celardo v. GNY Auto. Dealers Health & Welfare Trust*, 318 F.3d 142, 146 (2d Cir. 2003) ("We have . . . stressed that courts are not free to substitute their own judgment for that of the plan administrator as if they were considering the issue of eligibility anew." (citation, internal quotation marks and alterations omitted)). Thus, remand for consideration of the merits of DiMeglio's claim and, if warranted, a calculation of benefits is the appropriate remedy. *See Goletz v. Prudential Ins. Co.*, 425 F. Supp. 2d 540, 553 (D. Del. 2006) ("[R]emand may be the an appropriate remedy when additional evidence must be considered by the administrator to resolve a factual issue.").

## CONCLUSION

DiMeglio's motion for summary judgment is granted and Firestone's motion is denied. The decision to deny benefits based on section I(F) of the Plan is reversed and the matter remanded to the Plan administrator for proceedings consistent with this Memorandum and Order.

Rather than require DiMeglio to institute a new action should his claim be denied, the Court will retain jurisdiction; accordingly, the Clerk is directed to administratively close this case without prejudice to DiMeglio's right to restore jurisdiction, if needs be, by filing and serving a letter request within thirty (30) days of Firestone's final decision.

**SO ORDERED.**

/signed/

_____
FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
September 26, 2007